John G. EISELE, V, Appellant,

v.

Brian T. and Marcy L. MEYERS and Waldo Pizza Company, Inc., Respondents.

No. WD 51132.

Missouri Court of Appeals, Western District.

June 4, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 27, 1996.

Application to Transfer Denied Oct. 22, 1996.

---

Daniel DeFoe, G. Spencer Miller, Kansas City, for appellant.

Timothy Aylward, Kansas City, for respondents.

SPINDEN, Judge.

When a business deal between two cousins, John G. Eisele, V, and Brian T. Meyers, soured, Eisele sued Meyers, Meyers' wife, Marcy, and Waldo Pizza Company, Inc., for civil conspiracy. Eisele alleged that the Meyerses and Waldo Pizza conspired to deprive him of his ownership interest in Waldo Pizza. The Meyerses and Waldo Pizza counterclaimed that Eisele converted money from the corporation to his own use. A jury returned a verdict of $67,214.64 in favor of Eisele on his conspiracy claim and a verdict of $1650 in favor of the Meyerses on their conversion claim. The circuit court set aside the verdict on the conspiracy claim and entered judgment in favor of the Meyerses and Waldo Pizza. Eisele appeals.

Meyers and Eisele agreed in June 1987 to organize a corporation to operate Waldo Pizza in Kansas City. Meyers was an attorney, and Eisele owned part of another pizza restaurant. The parties dispute the details of their agreement.

Eisele contends that the two agreed to split the corporate stock equally. Meyers contends that they agreed that he would own 51 percent of the stock and that Eisele would own 49 percent.[1] Meyers and Eisele agreed, however, that in exchange for their respective shares of the stocks Eisele was to contribute his time, effort, labor and business expertise, and Meyers was to arrange for up to $60,000 in financing.

Meyers prepared the corporation's articles of incorporation and listed himself as the sole incorporator. On July 2, 1987, the Secretary of State issued a certificate of incorporation for the business. The articles indicated that the corporation would issue 30,000 shares of stock and that the corporation would have two directors on the board. On July 7, 1987, Meyers filed a document with the Secretary of State naming himself, his wife, his brother, and Eisele as the corporation's officers and directors.

According to minutes prepared by Meyers, the board of directors met on July 5, 1987.[2] Eisele contends that he was unaware of the meeting, but Meyers insists that Eisele was present. Meyers admitted that the meeting was not held on July 5 but sometime between

---

**1.** Meyers admitted telling Eisele, his relatives and other people that Eisele was his partner and that it was a "50/50 deal."

**2.** The corporate records for the July 5, 1987, meeting included call and notice documents, a waiver of notice and minutes.

July 2 and July 6.[3] The minutes indicated that Meyers and Eisele were named as directors and that subscribers to the stock were Meyers and his wife, 15,300 shares, and Eisele 14,700 shares. Eisele claims that he never agreed to Meyers' wife owning any stock. He also asserts that he never agreed to settling for only 49 percent of the stock.

On July 24, 1987, Eisele signed a lease in the name of Waldo Pizza. Eisele relinquished his ownership interest in the other pizza business and began organizing the new business and making plans for remodeling the building. Eisele prepared a projection of start-up costs and estimated monthly expenses for operations.

In mid-August 1987, Eisele received a bid of $47,300 for construction work which he had initially estimated at $15,000. The bid was higher than anticipated because it included the construction costs for the basement not included in the original plans. According to Meyers, he and Eisele did not accept that bid because Eisele said that he could do the basement work with the help of $5–an–hour laborers.

Corporation minutes indicate the directors convened another meeting on September 2, 1987, but Eisele said he was unaware of this meeting, too. The corporate records indicate that the meeting occurred pursuant to call and notice and by waiver of notice by the directors, but the call and notice and waiver documents are not in the corporate records. The minutes report that Meyers' wife was present, but Meyers admits that his wife was not there and that he signed for her.

On September 3, 1987, Eisele signed the July 5 and September 2 minutes. He also signed a $60,000 promissory note to repay $60,000 which Meyers had agreed to lend to the company. Eisele says that he did not read any of the documents before signing them.

At an October 2, 1987, directors' meeting, Meyers reviewed Eisele's summary of expenses spent remodeling the building. Meyers saw four entries showing that Eisele paid himself for his labor. According to Meyers,

Eisele was not to be paid for his labor, but Eisele testified that he believed he was entitled to be paid for his manual labor. Meyers also learned later of four additional checks Eisele had written to himself for labor. Eisele had also written a check for $200 to Mark Hayde for "labor," but Meyers later found out that the check was for Eisele's share of the rent for an apartment he shared with Hayde. Eisele had also written a check for $300 to Westport Pizza for a cooler or freezer, which had never been received.

Additional meetings were held on October 11 and 13, 1987. Meyers concluded that an additional $50,000 was necessary to get the restaurant open. Meyers told Eisele that he would have to pay his share if he wanted to participate in the business. At some point, Meyers and Eisele discussed Eisele's buying Meyers' interest in the business. Eisele claims that Meyers made a firm offer to sell his interest for $75,000. On October 16, 1987, Meyers offered to sell his share to Eisele for $89,000. Eisele denied that Meyers made the offer for $89,000.

On October 17, 1987, Meyers and Eisele met at the restaurant, and Meyers gave Eisele a written sale proposal. The proposal provided that if the sale did not close by October 20, Eisele would be terminated as an officer, director and employee of the corporation and would forfeit any right, title or interest in the corporation or its assets. Eisele did not execute the contract. Eisele said he came to the meeting prepared to pay $75,000 for the business, but he was not willing to pay $89,000.

On October 20, 1987, because Eisele did not accept Meyers' offer, Meyers, his wife, and Robert Meyers met to remove Eisele from the board of directors. No call and waiver of notice were issued regarding the meeting. On October 21, 1987, Meyers sent a letter to Eisele telling him that he had been terminated as an officer and director of Waldo Pizza and that he had no ownership interest in the corporation.

Waldo Pizza issued 15,000 shares of stock to Meyers and his wife on October 22, 1987.

---

**3.** Meyers admitted that he waited until September to prepare the July 5 minutes. He said that he did not prepare them until Liquor Control authorities required them for a liquor license.

The restaurant opened for business on November 6, 1987.

Eisele sued Meyers and his wife, individually and as trustees of Waldo Pizza, on October 2, 1992. Eisele's petition alleged breach of contract, breach of a fiduciary duty, fraudulent misrepresentation, conspiracy, conversion, misappropriation of trade secrets, tortious interference with a contract, and tortious interference with a prospective economic advantage. Eisele also sought an equitable accounting of the business and punitive damages. The Meyerses filed a motion to dismiss Eisele's petition, and the circuit court denied the motion.

On December 31, 1992, the Meyerses filed their answer and counterclaims to Eisele's petition. The counterclaims set forth four counts: breach of contract, misrepresentation, conversion and tortious interference with contract. Eisele filed a motion to dismiss the Meyerses' counterclaim for conversion on the ground that the claim was barred by the statute of limitations. The circuit court denied the motion.

The Meyerses filed a motion for judgment notwithstanding the verdict or, in the alternative, a motion for a new trial. On May 9, 1995, the circuit court set aside the jury verdict on the conspiracy count, and entered judgment in favor of the Meyerses. In the alternative, the circuit court set aside the verdict for Eisele and granted the Meyerses a new trial based on the court's finding that the jury verdict was against the weight of the evidence. Eisele appeals.

 In his first point, Eisele contends that the circuit court erred in overruling his motion to dismiss the Meyerses' counterclaim for conversion. He asserts that the counterclaim was time-barred by the statute of limitations. We agree.

An action for conversion has a five-year statute of limitations. Section 516.120, RSMo 1994; *see also Chemical Workers Basic Union Local No. 1744 v. Arnold Savings Bank*, 411 S.W.2d 159, 163 (Mo. banc 1966). The Meyerses pleaded in their counterclaim that they knew about Eisele's alleged conversion on October 2, 1987. They filed their counterclaim for conversion on December 31,

1992. We agree with Eisele that on the face of the Meyerses' pleadings they filed their counterclaim more than five years after the alleged conversion.

The Meyerses argue, however, that because Eisele filed his petition for damages on October 2, 1987, their counterclaim for conversion was not barred by the statute of limitations. They assert, "[W]here a counterclaim filed after the running of the statute of limitations is a defense or set-off against plaintiff's claim, the statute of limitation is not a bar to the counterclaim if the original action was filed before the limitations period expired." *See Northwest Radiation Oncology v. Goodstal*, 735 S.W.2d 762 (Mo.App. 1987). The Meyerses' counterclaim, however, was not a defense or set-off against Eisele's claim. It sought affirmative relief by asserting essentially a new cause of action. As the *Northwest Radiation* court said:

> Where the counterclaim seeks affirmative relief by asserting what is essentially a new cause of action, ... the statute of limitations properly bars the counterclaim.... With the exception of what might be considered to be purely defensive pleading such as a setoff or recoupment, a counterclaim [which asserts a new cause of action], although arising out of the same occurrence and although not barred at the commencement of the plaintiff's action, should be barred if the counterclaim for relief or damages is filed at a time when it would have been barred as an original action.

*Id.* at 766.

The Meyerses cite *Concrete Steel Company v. Reinforced Concrete Company*, 72 S.W.2d 118 (Mo.App.1934), in support of their contention that their counterclaim was not barred by the statute of limitations. The *Concrete Steel* court said, "[A] counterclaim is available, though the statutory period may have run before the filing of the answer setting it up, if it existed as a valid claim in the defendant's favor at the time of the commencement of the plaintiff's action[.]" *Id.* at 122. The counterclaim in *Concrete Steel*, however, alleged a plea of payment in full and a claim of additional credit on the account sued on by plaintiff. Hence, the *Con-*

*crete Steel* counterclaim was purely defensive, unlike the counterclaim in this case which seeks affirmative relief and not merely a set-off in damages.

The Meyerses also rely on *Turnbull v. Watkins,* 2 Mo.App. 235, 240 (1876), in which the court held: "The rule is well settled, both in England and in America, that a set-off or counterclaim, if not barred by limitation at the commencement of the suit, will be good, although it would otherwise be barred when first pleaded." The counterclaim in *Turnbull,* however, was essentially a claim for set-off.

Finally, the Meyerses cite § 516.370, RSMo 1994, which says:

> When a defendant in action has interposed an answer, as a defense, setoff or counterclaim, upon which he would be entitled to reply in such action, the remedy upon which, at the time of the commencement of such action, was not barred by law, and such complaint is dismissed, or the action is discontinued, the time which intervened between the commencement and the termination of such action shall not be deemed a part of the time limited for the commencement of an action by the defendant, to recover for the cause of action so interposed as a defense, setoff or counterclaim.

The Meyerses argue that "the effect of § 516.370 seems to be that the filing of plaintiff's petition tolls the limitation period on any defense, set-off or counterclaim raised thereafter, so long as such claim was not already time-barred at the point when plaintiff first filed his petition." This statute, however, has no application to the case before us. *See Northwest Radiation,* 735 S.W.2d at 765. Section 516.370 is a "savings" provision for counterclaims following the termination of a plaintiff's lawsuit.

We conclude that the Meyerses' counterclaim for conversion was neither a defensive pleading nor a claim for recoupment or set-off. The conversion claim sought affirmative relief and was essentially a new cause of action. Hence, the circuit court erred in not dismissing the Meyerses' counterclaim. The claim was barred by the five-year statute of limitation provided for in § 516.120.

■ In his second point, Eisele contends that the circuit court erred in granting the Meyerses' motion for judgment notwithstanding the verdict and setting aside the verdict in favor of Eisele on his claim for civil conspiracy. Eisele contends that substantial evidence supported the verdict. We disagree.

■ To establish civil conspiracy, Eisele had to produce clear and convincing evidence that "two or more persons [had] an agreement or understanding to do an unlawful act, and that, in pursuance of this agreement or understanding, they proceed[ed] to carry out their unlawful purpose to the damage of plaintiff." *Property Tax Representatives, Inc. v. Chatam,* 891 S.W.2d 153, 159 (Mo. App.1995); *Koehler v. Warren Skinner, Inc.,* 804 S.W.2d 780, 782 (Mo.App.1990).

Eisele contends that the conspiracy involved an agreement between the Meyerses and the Waldo Pizza to deprive Eisele of his ownership interest in Waldo Pizza. Eisele argues:

> Brian Meyers and Marcy Meyers agreed and on behalf of Waldo Pizza agreed to terminate John Eisele from the company.... The [Meyerses] communicated this to [Eisele] in a letter cast in terms of a formal resolution of the company and their decision was unanimous.... This communication showed clearly and convincingly, both from direct proof, and easily inferred, that the purpose had been accomplished. The letter of October 21 ... and the meeting of October 20 showed their intent. John Eisele, a member of Waldo Pizza board, had received no notice of the October 20, 1987 meeting.... He was not there.... John had not waived his presence for the meeting.... The corporate bylaws called for written call and notice.... Under the company rules, if John Eisele and Brian Meyers were not present, or otherwise waived their presence for the meeting, no quorum existed to do business.... As a result, [Eisele] would not have the opportunity to have an ownership interest in the company.... He would not also have the ability to be the restaurant manager.

Eisele did not establish by clear and convincing evidence a common design or meeting of the minds among the Meyerses and Waldo Pizza in any unlawful arrangement. *Chmieleski v. City Products Corporation,* 660 S.W.2d 275, 290 (Mo.App.1983). No evidence exists that the agreement between the Meyerses and Waldo Pizza to terminate Eisele's interest in the corporation was unlawful. Nor does any evidence exist that the Meyerses and Waldo Pizza believed or knew that such an agreement was unlawful.

Eisele argues that because the meeting in which he was terminated was held without issuance of formal notice or waiver of rights, terminating his association with the corporation was unlawful. No evidence exists, however, that the purpose or the objective of the agreement between the Meyerses and Waldo Pizza was to have an improper meeting of the corporation's directors. Their only agreement was to terminate Eisele's further involvement in the corporation. Their agreement had a lawful objective, even though it may have been accomplished through a technically defective method.

We affirm the circuit court's judgment setting aside the jury verdict for Eisele on the conspiracy count and entering judgment in favor of the Meyerses. We reverse, however, the circuit court's failure to dismiss the Meyerses' counterclaim for conversion which was beyond the statute of limitations and order that costs be divided equally.

LOWENSTEIN, P.J., and EDWIN H. SMITH, J., concur